***********
The Full Commission has reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Glenn and the briefs and oral arguments before the Full Commission and has further reviewed the evidence submitted pursuant to the Full Commission Order re-opening this case for additional evidence. The appealing party has shown *Page 2 
good grounds to reconsider the evidence. After reconsidering the evidence, the Full Commission modifies the Opinion and Award of the Deputy Commissioner and enters the following Opinion and Award.
 ***********
The Full Commission finds as a fact and concludes as a matter of law the following, which were entered into by the parties at the hearing and in the Pre-Trial Agreement as:
 STIPULATIONS
1. All parties are properly before the North Carolina Industrial Commission and the Industrial Commission has jurisdiction of the parties and of the subject matter of this case. All the parties are bound by and subject to the North Carolina Workers' Compensation Act. All parties have been correctly designated and there is no question as to the mis-joinder or non-joinder of any party.
2. Plaintiff sustained an admittedly compensable injury by accident while in the course and scope of employment with defendant-employer on January 19, 2003. Defendants accepted this claim and have been paying indemnity compensation to plaintiff in the amount of $345.35 per week from January 19, 2003 through the present.
3. The defendant-employer was insured for workers' compensation by Key Risk Insurance Company at all relevant times herein.
4. Plaintiff's average weekly wage was $518.03 per week, yielding a compensation rate of $345.35 per week, at all relevant times herein.
5. There was an employee-employer relationship between plaintiff and defendant-employer at all relevant times herein.
6. The following exhibits were admitted into evidence at the hearing: *Page 3 
 a. Stipulation #1A 1B, IC forms, pleading and plaintiff's medical records;
 b. Stipulation #2, Dr. Hammond's March 24, 2005 deposition;
 c. Stipulation #3, Dr. Gualtieri's October 6, 2006 deposition;
 d. Stipulation #4, Advantage Surveillance, Inc.'s written report;
 e. Defendants' #1; photo of plaintiff by Mr. Hester;
 f. Defendants'#2, Mr. Earp's report of May 15, 2006 through May 20, 2006;
 g. Defendants'#2a, video of May 15, 2006 through May 20, 2006 by Mr. Earp;
 h. Defendants' #3, written report of Mr. Earp of June 6, 2009;
 i. Defendants' #3a, video by Mr. Earp of June 6, 2009;
 j. Plaintiff's #1, Letter of August 28, 2008 from Mr. Anderson to Mr. Prather;
 k. Plaintiff's #2, e-mail of September 16, 2008;
 l. Plaintiff's #3, e-mail of June 10, 2009 from Mr. Prather to Mr. Anderson;
 m. Plaintiff's #4, March 15, 2003 letter from Mr. Hargett requesting attendant care;
 n. Plaintiff's #5, Armstrong curriculum vitae; and,
 o. Plaintiff's #6, schedule of wages/fees for sitter position.
7. The issues to be determined from this hearing are as follows:
 a. Whether plaintiff is no longer disabled as a result of the compensable injury?
 b. Whether plaintiff is unable to work solely as a result of his illegal immigration status in the United States? *Page 4 
 c. Whether plaintiff's right to receive further disability compensation should be terminated as a result of his use of an alias in filing this claim and/or as a result of his illegal immigration status at the time of injury?
 d. Whether plaintiff's claim for further benefits should be barred, or the award of benefits set aside, due to misrepresentation and/or fraud?
 e. Whether plaintiff should be sanctioned for prosecuting his claim after misrepresenting his identity, working illegally in the United States, and/or misrepresenting his physical condition?
 f. Whether the Form 24 filed by defendants was incorrectly disapproved by an Administrative Decision and Order filed March 2, 2007?
 g. Whether plaintiff, and/or others, are entitled to compensation for retroactive and prospective attendant care services; and if so, in what amount?
 h. Whether plaintiff is entitled to attorney's fees?
 i. Whether plaintiff is entitled to further medical treatment pursuant to N.C. Gen. Stat. § 97-25?
 ***********
Based upon the competent evidence of record, the Full Commission makes the following:
 FINDINGS OF FACT
1. At the time of hearing, plaintiff was 55 years old. Plaintiff through counsel filed a Form 18 on April 22, 2003 in the name of Raul Vanegas a/k/a Mario Seguro-Suarez, as plaintiff was employed under the alias of Raul Vanegas. *Page 5 
2. On January 19, 2003, plaintiff sustained an admittedly compensable injury by accident while in the course and scope of his employment with defendant-employer when he fell approximately 18 feet and struck his head on concrete. As a result of his fall, plaintiff sustained a severe traumatic brain injury which caused him to be unconscious and unresponsive. In addition, plaintiff sustained a fractured clavicle, fractured temporal bone, and fractured right zygomatic arch.
3. Plaintiff was transported from the job site to Lincoln Medical Center by Lincoln EMS at which time it was observed that plaintiff had an obvious head injury with blood coming from his nose and mouth.
4. An examination at Lincoln Medical Center further revealed findings which were indicative of either a cranial nerve injury or an impending herniation of the brain, or both. Plaintiff had a Glasgow Coma Scale score of three. The emergency department physician determined that plaintiff was in critical condition and arranged for him to be emergently transported via helicopter to Carolinas Medical Center. A repeat Glasgow Coma Scale test was conducted by the helicopter medical team at which time plaintiff was noted to have no pulse and a Glasgow Coma Scale score of three.
5. The Glasgow Coma Scale score is used to measure neurological status and responsiveness in injured patients. There are three components to the Glasgow Coma Scale-verbal responsiveness, eye opening responsiveness and motor response. Each of the three components are scored from one (no response) to five (appropriate and full response). When the scores from each of the three components are added together, the Glasgow Coma Scale score ranges from three to 15. A Glasgow Coma Scale score of three to eight indicates severe brain injury and is associated with a poor, long-term outcome. *Page 6 
6. Plaintiff's CT scans revealed that he suffered a right anterior temporal bleed with intercranial hemorrhage and a two centimeter by two centimeter subdural hematoma of the temporal lobe. Contusions were also noted to both temporal lobes.
7. As a direct result of the injuries to plaintiff's temporal lobe, plaintiff has significant behavioral and memory deficits.
8. Plaintiff sustained three contusions to the left frontal lobe of the brain. The contusions were caused when plaintiff's brain moved forward and backward and impacted the inside of his skull when his head struck the concrete.
9. As a direct result of the injuries to plaintiff's frontal lobe, plaintiff has significant deficits with executive functioning, problem solving, planning, and has experienced personality changes.
10. The brain stem is located at the base of the brain. The brain stem controls automatic functioning such as respiration and balance. Plaintiff suffered a subdural hematoma (bleeding) around the brain stem. A subdural hematoma around the brain stem increases the pressure on the brain and can lead to brain herniation, which usually results in death.
11. As the direct result of plaintiff's brain stem injury, plaintiff's respiration was acutely affected, requiring intubation and ventilation support. In addition, as a direct result of the brain stem injury, plaintiff has continued to experienced chronic balance problems which have resulted in multiple falls.
12. Plaintiff's CT scans also revealed effaced cisterns, indicative of swelling and edema in the brain and enceplalomalacia, indicative of a shearing injury. A shearing injury occurs when axons (nerve fibers) are torn apart due to excessive force. Research studies have *Page 7 
determined that effaced cisterns are a likely predictor of poor, long-term outcome in a patient experiencing traumatic brain injury.
13. Upon arrival at Carolinas Medical Center, Dr. Richard Finger, a neurosurgeon, performed emergency surgery in which he drilled a burr hole and placed a ventriculostomy drain to reduce and relieve pressure on plaintiff's brain. Following surgery, plaintiff remained an inpatient at Carolinas Medical Center from January 18, 2003 through January 31, 2003.
14. While an inpatient, plaintiff slowly emerged from his comatose state, at which time physicians ordered physical therapy, speech therapy and occupational therapy.
15. While an inpatient at Carolinas Medical Center, plaintiff remained confused and was often not oriented to name, time or place. As a result of his decreased mental status, plaintiff traumatically removed his intubation tube, Foley catheter, and Dubbhoff (feeding) tube.
16. While an inpatient at Carolinas Medical Center, multiple physicians treating plaintiff documented that plaintiff would need 24 hour care and supervision upon discharge.
17. While an inpatient, case workers at Carolinas Medical Center notified representatives of the defendant, Key Risk Insurance, on numerous occasions that plaintiff would need 24 hour care upon discharge. Case workers from Carolinas Medical Center made efforts to determine if plaintiff's wife who was residing in Costa Rica could come to take care of him upon discharge. A medical note from Carolinas Medical Center dated January 24, 2003 states, "[p]atient has a daughter who is 18 years old and she lived with her father prior to this accident. Not sure that she can provide 24 hour care for Patient post rehab. Patient remains confused and will need 24 hour care post rehab. His wife is in Costa Rica. This case appears to be a work comp claim although I have not spoken to a case manager despite attempts to speak with one. *Page 8 
Will f/u with work comp for disposition. Patient has no other family support here except his daughter."
18. On January 31, 2003, plaintiff was transferred from Carolinas Medical Center to the Charlotte Institute of Rehabilitation, where he came under the care of Dr. Flora Hammond. Dr. Hammond oversaw plaintiff's inpatient care at Carolinas Institute of Rehabilitation from January 31, 2003 until his discharge on February 14, 2003.
19. Dr. Flora Hammond is a board-certified physical medicine and rehabilitation physician who practices at Charlotte Institute of Rehabilitation. Dr. Hammond is fellowship trained in treating brain injuries. Dr. Hammond is currently the director of the brain injury program and the director of the brain injury research program at Carolinas Institute of Rehabilitation. In addition to her clinical and research work, Dr. Hammond teaches and oversees residents in physical medicine and rehabilitation. Dr. Hammond has published approximately 50 peer reviewed articles, more than 90 percent of which have been on the topic of traumatic brain injury. Dr. Hammond has also co-authored two textbook chapters on the subject of brain injury.
20. While an inpatient at Carolinas Institute of Rehabilitation, plaintiff participated in a comprehensive inpatient rehabilitation program, receiving occupational therapy, physical therapy, speech therapy, and psychological treatment. Upon discharge from Carolinas Institute of Rehabilitation on February 14, 2003, Dr. Hammond noted that plaintiff needed constant 24 hour supervision. Defendants were obligated to arrange for the provision of the care plaintiff needed upon discharge.
21. Debra Wentz was a senior claims specialist in workers' compensation for Key Risk Insurance at the time of plaintiff's injury. She was the adjuster handling plaintiff's injury claim. Since plaintiff's injury involved inpatient hospitalization, a nurse case manger, Mary *Page 9 
McGhee, was assigned to plaintiff's case. Ms. McGhee was an employee of Key Risk Insurance and had the duty of coordinating plaintiff's case while he was receiving inpatient care. However, Ms. Wentz had to approve the services provided.
22. Ms. Wentz and Ms. McGhee were aware that plaintiff required 24 hour assistance upon discharge. Ms. Wentz and Ms. McGhee were also aware that efforts to arrange for care through plaintiff's wife were unsuccessful. They considered assisted living facilities, but decided family care would be better, especially considering the language barrier.
23. Ms. Wentz and Ms. McGhee then arranged for plaintiff's 18-year-old daughter who had been in the United States for approximately two months to care for plaintiff after his discharge from Carolinas Institute of Rehabilitation on February 14, 2003.
24. After his discharge, the coordination of plaintiff's medical case management was transferred to Lynne Hudgins, a field case manager employed by Key Risk Insurance. Ms. Wentz remained the adjuster for plaintiff's claim.
25. Dr. Hammond ordered outpatient therapy for plaintiff which was performed at Optima Therapies. An evaluation on February 19, 2003 revealed that plaintiff was dependent on others for: (1) dressing, (2) feeding, (3) toileting, (4) activities of daily living, (5) grooming, (6) bathing, and (7) home management.
26. Plaintiff's former attorney requested that Key Risk Insurance compensate plaintiff's daughter for the care she was providing. Ms. Wentz acknowledged that she received written requests for compensation for the care being provided by plaintiff's daughter on February 24, 2003, on or about March 14, 2003 and on April 22, 2003. Ms. Wentz asked for employment information on plaintiff's daughter concerning where she was employed and her average weekly *Page 10 
earnings. By letter dated April 22, 2003, plaintiff's attorney advised Ms. Wentz that plaintiff's daughter had not been employed since coming to the United States.
27. When Plaintiff was discharged on February 14, 2003, his daughter, Vivianna Seguro Arce was his sole caretaker. Ms. Arce understood that Plaintiff required 24 hour care. Ms. Arce had to dress and bathe Plaintiff, and assist him in walking to the bathroom or other places in the house, put him in bed, cook, give him his medications, and attend his medical appointments. Plaintiff experienced double vision and would get dizzy and fall. Plaintiff had many falls and his daughter could not always prevent the falls due to plaintiff's weight. Ms. Arce weighed about 120 pounds at the time and plaintiff weighed approximately 200 pounds. Plaintiff would also experience mood changes and would sometimes become aggressive and start yelling, screaming and throwing things. Ms. Arce was often afraid for her own safety.
28. The testimony of Ms. Arce concerning the type of care she provided to plaintiff is accepted as credible. Based upon the testimony of Ms. Arce concerning the services she provided to plaintiff, the testimony of Barbara Armstrong, a certified life care planner, and the description given for the duties of home health aides shown in plaintiff's exhibit 6, the level of care Ms. Arce provided most nearly approximates the type of care provided by a home health aide.
29. Living with and caring for her father was hard for plaintiff's daughter. After about over two months, Ms. Arce moved out of the home and her father began living with Ms. Ana Isabel Quesado Aguero, a family friend. Ms. Arce knew Ms. Aguero from Costa Rica.
30. Plaintiff's daughter was never paid for the attendant care services she provided. Defendants' contention that they never denied a bill for attendant care services is unpersuasive. Ms. Wentz did not need employment information on Plaintiff's daughter to determine fair *Page 11 
compensation for the services being provided. It appears from her testimony that Ms. Wentz was aware plaintiff's daughter had no experience in providing the level of care plaintiff needed and that payment for the attendant care services provided by plaintiff's daughter could be based upon what a person providing comparable services would have earned.
31. Defendants' failure to pay Ms. Arce for the attendant care services that they arranged for her to provide was unreasonable and defending plaintiff's request for such services constituted stubborn, unfounded litigiousness.
32. Based upon the greater weight of the evidence, Ms. Arce provided attendant care services to plaintiff for a total of 11 weeks. At the time the care was provided, plaintiff required 24 hours of care per day, seven days a week. The evidence shows that the minimum wage in 2003 was $5.15 per hour and the hourly wage for a nurse's aide or home health aide was $10.00 per hour. The Full Commission finds that the care provided by Ms. Arce was comparable to that of a nurse's aide or home health aide, but because she was inexperienced, her rate of pay should be less. A reasonable rate of pay for Ms. Arce is $7.00 per hour.
33. As of May 16, 2003, Ms. Wentz became aware through reports from Ms. Hudgins that plaintiff was living with and receiving care from a friend by the name of "Ana." Defendants made no effort to compensate Ms. Aguero for the care she was providing to plaintiff. It is unclear from the evidence how long Ms. Aguero provided care to plaintiff, but based upon case manager reports from Ms. Hudgins and medical notes in the record Ms. Aguero was still assisting plaintiff when he saw Dr. Yuert on January 30, 2007 and when Ms. Armstrong did her life care assessment in August 2007. Ms. Aguero is entitled to compensation for the attendant care services she provided to plaintiff. Defendants' contention that Ms. Aguero never asked for compensation is unpersuasive. Since Ms. Aguero was unavailable at the time of hearing, the Full *Page 12 
Commission, in the interest of justice, is reserving for subsequent determination the amount of compensation owed for the services Ms. Aguero provided to plaintiff.
34. Key Risk Insurance Company had actual knowledge of the multiple recommendations and orders for 24 hour care for plaintiff from multiple physicians at Carolinas Medical Center, from Dr. Hammond, an authorized treating physician, and from Dr. Ewert. Notwithstanding their actual knowledge, Key Risk Insurance Company made no effort and took no steps to arrange for such care after Ms. Arce left, or to pay for the care they arranged for Ms. Arce to provide.
35. In late 2003, Dr. Hammond ordered neuropsychological testing. The test results revealed: (1) fine motor speed deficits, (2) decreased grip strength, (3) visual deficits, (4) cognitive impairment, (5) memory impairment, (6) problem solving deficits, and (7) poor attention.
36. Dr. Hammond continued to treat plaintiff on an outpatient basis until April 2005. During that time, plaintiff experienced severe headaches, agitation, irritability, difficulty sleeping, double vision, dizziness, cognitive impairment, memory problems, and balance disturbance. As a result of the above, plaintiff fell on a number of occasions, sustaining further injury. Dr. Hammond is of the opinion that all of plaintiff's deficits were the result of his traumatic brain injury.
37. As a result of the multiple falls, Dr. Hammond ordered an occupational therapy home evaluation. However, Key Risk Insurance Company denied Dr. Hammond's order and refused to provide the home evaluation. *Page 13 
38. During 2004 and 2005, Dr. Hammond performed testing on plaintiff, including the Romberg test. Plaintiff had a positive Romberg test, indicating ongoing brain stem dysfunction and balance deficits.
39. During 2003, 2004, and 2005, plaintiff had bilateral nystagmus, which is a rapid involuntary movement of the eyes caused by brain stem injury and dysfunction.
40. In early 2005, Dr. Hammond ordered an evaluation by a neurologist. Instead of arranging a neurological evaluation, Ms. Lynne Key, the nurse case manager, arranged for an evaluation with Dr. Thomas Gualtieri, a neuropsychologist. Dr. Hammond subsequently agreed that this change in her recommendation was an appropriate alternative. Although Dr. Hammond never released plaintiff from her care, the defendants thereafter refused to authorize additional treatment with Dr. Hammond and instead only authorized treatment with Dr. Gualtieri. The Deputy Commissioner subsequently ordered defendants to authorize treatment for plaintiff with Dr. Hammond and he retuned to Dr. Hammond on November 12, 2008. The Full Commission affirms this Order.
41. Dr. Hammond has not wavered in her opinion that plaintiff is totally disabled as a direct result of his traumatic brain injury and resulting deficits. Dr. Hammond is of the opinion that plaintiff still can not live independently and that plaintiff has been in need of and will always be in need of 24 hour supervision. Dr. Hammond recommended that plaintiff's continued treatment be done by Dr. Lori Grafton.
42. On March 9, 2005, upon direct referral from defendant, Key Risk Insurance Company, Dr. Gualtieri evaluated plaintiff. Dr. Gualtieri treated plaintiff from March 9, 2005 to April 2007. Dr. Gualtieri initially had the impression that plaintiff suffered from a conversion disorder and/or a somatoform pain disorder. Dr. Gualtieri did not believe plaintiff was *Page 14 
malingering and he felt plaintiff was permanently and totally disabled. However, after being shown a 45 minute "highlight" video, pieced together by defendants from approximately nine hours of footage covering over six months of surveillance, and reassessing the test results and his history of treatment of plaintiff, Dr. Gualtieri testified that he might have to revise his opinion.
43. Dr. Gualtieri then opined that plaintiff was probably willfully exaggerating his symptoms and further stated that "I don't really recommend any additional treatment for Mr. Seguro-Suarez. He wants to go back to Costa Rica. I think that's an appropriate place for him to return to. He does not look like a gentleman who needs attendant care or needs to be looked after."
44. The Full Commission gives greater weight to the opinion testimony of Dr. Hammond over that of Dr. Gualtieri. Dr. Hammond is fellowship trained in brain injury treatment and has done extensive clinical work and research in the area of brain injury.
45. Dr. Hammond was shown the same "highlight" video and was of the opinion that what plaintiff was shown doing in the video is consistent with her diagnosis and treatment. She noted that on the video, plaintiff was shown driving. Dr. Hammond recommended that plaintiff not drive, and observed that plaintiff never looked back or used the rearview mirror even though he was backing the vehicle out of the driveway. Dr. Hammond testified one of the problems a person tends to have with the kind of injury plaintiff has, is not paying attention to the task being performed.
46. Dr. Jeffrey Ewert is one of only two board-certified neuropsychologists in Charlotte, North Carolina. Dr. Ewert has been evaluating and treating brain injured individuals since 1980 and has treated several thousand patients with brain injuries since 1980. Dr. Ewert is a frequent lecturer and presenter on the topic of brain injury. Dr. Ewert reviewed plaintiff's *Page 15 
medical records and performed neuropsychological testing on plaintiff. Dr. Ewert is of the opinion that plaintiff sustained a severe traumatic brain injury as evidenced by the Glasgow Coma Scale score findings, CT scans, and neuropsychological testing. Dr. Ewert is of the opinion that plaintiff continues to have severe and profound deficits as the direct result of his compensable brain injury.
47. Dr. Ewert is of the opinion that plaintiff is permanently and totally disabled by virtue of his traumatic brain injury and resulting deficits and that plaintiff has been in need of 24 hour care since his discharge from Carolinas Institute of Rehabilitation on February 14, 2003. Dr. Ewert is of the opinion that plaintiff will need 24 hour care for the remainder of his life. The Full Commission gives great weight to the opinion testimony of Dr. Ewert.
48. Barbara Armstrong is a registered nurse, certified case manager and certified life care planner. Ms. Armstrong was one of the first two life care planners in the State of North Carolina. As a registered nurse and certified life care planner, Ms. Armstrong has cared for and evaluated over 500 individuals with traumatic brain injuries. As part of her training as a life care planner, Ms. Armstrong received specific education and training on the evaluation of attendant care needs.
49. Ms. Armstrong met with and evaluated plaintiff on two separate occasions. Ms. Armstrong also interviewed plaintiff's daughter and Ms. Aguero, who provided care for plaintiff for a number of years.
50. Ms. Armstrong was of the opinion that plaintiff has been in need of 24 hour attendant care since he was discharged from Carolinas Institute of Rehabilitation on February 14, 2003. Ms. Armstrong is also of the opinion that plaintiff is presently in need of 24 hour care and will need 24 hour care in the future. *Page 16 
51. Ms. Armstrong opined that plaintiff currently needs unskilled or companion type care and she provided information which reflected the rates from 2003 through the present for: (1) minimum wage, (2) prevailing market rate for private hire home health aides providing attendant care services, and (3) the prevailing rate for hire through a home health agency. The Full Commission gives great weight to the testimony of Ms. Armstrong.
52. The Full Commission finds no merit to the issues raised by defendants that plaintiff is not able to find work because of his illegal immigration status, that he should not receive compensation because he used an alias in filing this claim, and that plaintiff committed fraud because he misrepresented his identity and was working illegally in the United States.
53. The Full Commission finds that plaintiff has needed 24 hour attendant care from the time of his discharge from Carolinas Institute of Rehabilitation on February 14, 2003 through November 2, 2010, when Dr. Grafton re-evaluated plaintiff and reduced his need for attendant care to 12 hours per day at the companion/sitter level. The Full Commission further finds that the current arrangements approved by Dr. Grafton for plaintiff's care as reported by the Industrial Commission Nurse are reasonable, considering plaintiff's current living arrangement.
54. Pursuant to an order of the Full Commission, the North Carolina Industrial Commission Medical Rehabilitation Nurses Section conducted a home visit and assessment of plaintiff. The reports of the Industrial Commission Nurse are admitted into evidence. According to the report of the Industrial Commission Nurse, defendants assigned a clinical coordinator and were working to arrange for a Spanish speaking care giver to provide 12 hours per day of companion/sitter level assistance and for a licensed practical nurse to see plaintiff twice monthly to assist with his medications. Defendants are also arranging to provide transportation for plaintiff to his medical providers. Dr. Grafton wrote a prescription on November 2, 2010 for *Page 17 
plaintiff to receive 12 hours per day of companion/sitter services, skilled nursing services twice a month and transportation to physician and therapy appointments. Dr. Grafton also changed plaintiff's medications, indicated he is unable to work and set up a return appointment.
55. The Full Commission finds as fact that as a result of plaintiff's admittedly compensable traumatic brain injury, he has cognitive deficits including inconsistent problem solving, memory deficits, poor attention span, visual deficits, nystagmus, vision and balance deficits resulting in numerous falls, impaired concentration, personality changes, headaches, dizziness, and motor skill impairment. Plaintiff also sustained shoulder and neck injuries. As a result of his injury, plaintiff has been incapable of working in any employment and is entitled to continuing temporary total disability compensation from the date of injury to the present and continuing until further order of the Commission and also continuing medical treatment.
56. Defendants have defended plaintiff's claim for retroactive and prospective attendant care without reasonable ground. Despite multiple physician recommendations for 24 hour attendant care and the requests from plaintiff's counsel for compensation for the care provided to plaintiff by family and friends, defendants failed to either provide attendant care or compensate others for the care they provided to plaintiff. After denying authorization and payment for attendant care since 2003, defendants now contend they cannot determine how much care was actually provided or who provided such care. The Full Commission finds, however, that defendants have made no efforts to obtain such information.
 ***********
Based upon the foregoing stipulations and findings of fact, the Full Commission makes the following:
 CONCLUSIONS OF LAW *Page 18 
1. Plaintiff sustained an admittedly compensable injury by accident while in the course and scope of his employment with defendant-employer on January 19, 2003, resulting in a severe traumatic brain injury and injury to his shoulder and neck. N.C. Gen. Stat. § 97-2(6).
2. Plaintiff has proven that as a result of his January 19, 2003 work injury he needed 24 hour per day attendant care from the time of his discharge from Carolinas Institute of Rehabilitation on February 14, 2003 through November 2, 2010, when Dr. Grafton re-evaluated him and reduced his need for attendant care to 12 hours per day of companion/sitter care. Defendants are obligated to pay for such care. Attendant care constitutes "other treatment" under the definition of medical compensation. N.C. Gen. Stat. §§ 97-2(19), 97-25.
3. Dr. Flora Hammond and Dr. Jeffrey Ewert opined that Plaintiff is and continues to be permanently and totally disabled from any employment, requires 24-hour attendant care services, and continues to need medical treatment for his injuries as a direct result of his admittedly compensable injury by accident on January 19, 2003. The opinion testimony of Dr. Hammond and Dr. Ewert is sufficient to meet Plaintiff's burden of proving continuing medical disability under the first prong of Russell v. Lowes Prod. Distrib., and Plaintiff is therefore entitled to continuing temporary total disability compensation until further Order of the North Carolina Industrial Commission. N.C. Gen. Stat. §§ 97-18.1, 97-29;Russell v. Lowes Prod. Distrib.,108 N.C. App. 762, 765, 425 S.E.2d 454, 457 (1993).
4. Plaintiff is entitled to medical compensation for his admittedly compensable injuries, including but not limited to the treatment provided thus far by his several treating physicians and the treatment recommended in the future by Dr. Ewert, Dr. Lori Grafton, and his other treating physicians. N.C. Gen. Stat. § 97-25. *Page 19 
5. Dr. Grafton should be authorized to continue to treat plaintiff for his traumatic brain injury. N.C. Gen. Stat. § 97-25.
6. Plaintiff's average weekly wage was $518.03 per week, yielding a compensation rate of $345.35 per week. N.C. Gen. Stat. § 97-2(5).
7. Plaintiff's claims are not barred by his use of an alias, his use of an invalid Social Security number, or his alien status. N.C. Gen. Stat. § 97-2(2), Ruiz v. Belk Masonry,148 NC. App. 675, 559 S.E.2d 249 (2002).
8. Defendants brought and defended this claim without reasonable grounds. As a result, plaintiff has been forced to litigate in order to obtain compensation for attendant care services provided by plaintiff's daughter with whom defendants made arrangements to provide attendant care, and for Ms Aguero. Plaintiff's daughter has had to travel from her out of state home to three hearings. Plaintiff has also been forced to defend defendants' effort to terminate his compensation due to allegations of fraud and misrepresentation as a result of his immigration status. The law on these issues has already been determined by statute and by case law and defendants' position is not based upon reason. Therefore, defendants are obligated to pay plaintiff's attorney fees and the travel costs for plaintiff's daughter. N.C. Gen. Stat. § 97-88.1; Hedges v. Wake CountyPublic School System, ___ N.C. App. ___, 699 S.E.2d 124 (2010).
9. Plaintiff is entitled to compensation for attendant care services provided by his daughter, Ms. Viviana Seguro Arce, Ms. Ana Isabel Quesado Aguero, a family friend, and other individuals who provided such care. For the 11 weeks of care provided by Ms. Arce, defendants are obligated to pay at the rate of $7.00 per hour, for 24 hours per day, seven days per week.
 *********** *Page 20 
Based upon the foregoing stipulations, findings of fact, and conclusions of law, the Full Commission makes the following:
 A W A R D
1. Subject to the attorney's fees approved below, defendants shall pay compensation to plaintiff in the amount of $345.35 per week beginning on January 19, 2003 and continuing through the hearing of this matter and thereafter until further Order of the North Carolina Industrial Commission. Defendants are given credit for benefits paid to plaintiff.
2. Defendants shall pay all medical expenses incurred or to be incurred in the future by plaintiff as a result of his admittedly compensable injury by accident when the medical bills have been submitted according to procedures established by the North Carolina Industrial Commission.
3. Dr. Lori Grafton at Carolinas Institute of Rehabilitation is hereby designated as plaintiff's authorized treating physician as to his brain injury and related problems.
4. Defendants shall pay to plaintiff compensation for attendant care services provided by Ms. Viviana Seguro Arce in the amount of $12,936.00. Defendants shall also reimburse Ms. Arce at the travel rate allowed by the Internal Revenue Service for the three trips she made for Deputy Commissioner hearings. This amount shall not be reduced for attorney's fees. Defendants shall pay to plaintiff's counsel 25 percent of said amount for their unreasonable defense over a period of approximately eight years of plaintiff's claim for attendant care compensation owed to Ms. Arce.
5. In addition to the attorney's fee above, plaintiff's counsel is awarded an attorney's fee for time expended on defending the unreasonable claims brought by defendants. Plaintiff's attorney shall submit an Affidavit showing time expended in this case. *Page 21 
6. Since Ms. Aguero was unavailable at the time of the hearing before the Deputy Commissioner, the Full Commission, in the interest of justice, shall reserve for subsequent determination the amount of compensation owed for the attendant care services she provided to plaintiff.
7. Defendants shall pay the costs of these proceedings.
This the ___ day of April 2011.
 S/___________________ BERNADINE S. BALLANCE COMMISSIONER
CONCURRING:
 S/_____________ LAURA KRANIFELD MAVRETIC COMMISSIONER
 S/_____________ CHRISTOPHER SCOTT COMMISSIONER *Page 1